Bradley C. Gage, Esq., S.B. No. 117808
(brad@bradgagelaw.com)
Milad Sadr, Esq., S.B. No. 245080
(milad@bradgagelaw.com)
**BRAD GAGE LAW, APC**
23002 Victory Boulevard
Woodland Hills, California 91367
(818) 340-9252 Fax: (818) 340-9088

Thurgood Wynn, Esq., S.B. No. 345199
(Thursgood@BenCrump.com)
**BEN CRUMP LAW FIRM**
633 Pennsylvania Avenue NW., Fl. 2
Washington, D.C. 20004
Tele.: (530) 739-1303

Jeffrey Spencer, Esq. (SBN 182440)
(jps@spencerlaw.net)
**THE SPENCER LAW FIRM, INC.**
2 Venture, Suite 220, Irvine, CA 92618
Tel. (949) 240-8595 Fax (949) 377-3272

Attorneys for Plaintiffs,
IAN GREENE, DEONDRE MARQUES JONES,  and
the PUTATIVE CLASS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IAN GREENE, and DEONDRE MARQUES JONES, in their Individual and Representative Capacities on Behalf of a Class of All Persons similarly situated,<br>Plaintiffs,<br><br>v.<br><br>CITY OF BEVERLY HILLS, MARK STAINBROOK, JERRY WHITTAKER, PIERRE ROMAIN, SEAN REYNOLDS, JAKE SPURGEON, ERIC PENA, and MATTHEW LOPEZ, , inclusive, all sued in their individual capacities, Defendants. | Case No. 2:24-cv-05916-FMO-RAO<br><br>Judge:      Hon. Fernando M. Olguin<br>Crtrm.:      6D<br><br>**SECOND AMENDED COMPLAINT**<br><br>1.    MALICIOUS PROSECUTION<br>2.    UNLAWFUL SEIZURES<br>3.    UNLAWFUL SEARCHES<br>4.    MUNICIPAL LIABILITY<br>5.    VIOLATION OF EQUAL PROTECTION<br>6.    VIOLATION OF BANE ACT<br>7.    FALSE ARREST/IMPRISONMENT |

## SECOND AMENDED COMPLAINT FOR MONETARY DAMAGES, INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL

Plaintiffs assert the following claims and hereby demand a jury trial for themselves and all members of the Class.

## I.    VENUE AND JURISDICTION

1.    Plaintiffs IAN GREENE (hereinafter, collectively "Plaintiff," or "GREENE"), and DEONDRE MARQUES JONES (hereinafter, collectively "Plaintiff," or "JONES"), bring this action on their own behalf and on behalf of all persons within the class defined herein.

2.    This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff asserts claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution. This Court has jurisdiction over the State claims by virtue of supplemental jurisdiction.  Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and all incidents, events, and occurrences giving rise to this action occurred in this district.  The class representatives will not pursue any claims that are inconsistent with the class.

## II.    CLASS ALLEGATIONS

3.    The Class consists of the following: All Black people who were detained or arrested without being convicted of any crime by the City of Beverly Hills Police Department ("BHPD") from July 15, 2022 forward.

4.    Further, the Class consists of the following subclasses:

a.    All Black people who were maliciously prosecuted by the City of Beverly Hills Police Department ("BHPD") from July 15, 2022 forward.

b.    All Black people who were detained without reasonable suspicion or arrested without probable cause by the City of Beverly Hills Police Department

**SECOND AMENDED COMPLAINT**

("BHPD") from July 15, 2022 forward.

c.      All Black people who were searched, or property searched, without a warrant or reasonable suspicion by the City of Beverly Hills Police Department ("BHPD") from July 15, 2022 forward.

d.      All Black people whose vehicles were seized within the meaning of the Fourth Amendment by the City of Beverly Hills Police Department ("BHPD") from July 15, 2022 forward, in the absence of a valid caretaking purpose.

5.      The BHPD is a subdivision of the Defendant City of Beverly Hills.

6.      The disparate impact of arresting such a disproportionate percentage of Black Americans compared with other races is because of Defendants' policies, practices and customs that had a discriminatory intent and discriminatory effect.

## III. COMPLIANCE WITH FEDERAL RULE 23

**7.**      Federal Rule of Civil Procedure 23(a) provides the following requirements for class actions:

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable.

(2) there are questions of law or fact common to the class. Here, the claims for all class members involve civil rights violations subject to the same law and facts.

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class. Here, because the claims all involved civil rights violations with the same law, the defenses and claims are all typical of those of the class.

(4) the representative parties will fairly and adequately protect the interests of the class.  They will not take an interest contrary to the class.

8.      The attorneys for the class are experienced lawyers in civil rights cases,

**SECOND AMENDED COMPLAINT**

and in class actions.

9.    Local Rule 23-2.2 sets forth similar requirements for class allegations. It provides that the Class Allegations section of a complaint "shall contain appropriate allegations thought to justify the action's proceeding as a class action, including, but not limited to:

"(a) The definition of the proposed class (the class and subclasses are defined above);

"(b) The size of the proposed class;

"( c) The adequacy of representation by the representative(s) of the class. Here, the plaintiffs are adequate class representatives because they were arrested or detained during the class period, and they were not convicted of any crimes and did not plea to anything, just as the class members they represent;

(d) The commonality of the questions of law and fact (see above);

(e) The typicality of the claims or defenses of the representative(s) of the class are typical of all class members (see above);

(f) If proceeding under F.R.Civ.P. 23(b)(3), allegations to support the findings required by that subdivision are provided herein; and

(g) The nature of notice to the proposed class required and/or contemplated. Here, we propose notice via CPT Group, Inc. as Claims Administrator, or such other administrator as the Court approves.  The defendants are in possession of the names and addresses of all individuals in the class and thus can provide that information in order to give the class notice.)

10.    Plaintiffs and the Class will not be able to obtain effective and economic legal redress unless the action is maintained as a class action. Here, Plaintiffs and the Class will not recover economically from defendants without filing as a class. The numerous Plaintiffs makes individual recovery unlikely. Additionally,

- 4 -
**SECOND AMENDED COMPLAINT**

Plaintiffs are alleging widespread discrimination to a protected class of persons.

11.    There is a community of interest in obtaining appropriate legal and equitable relief for the common law and statutory violations and other improprieties, and in obtaining adequate compensation for the damages and injuries which Defendants' actions have inflicted upon each Plaintiff and the Class as a whole.  Here, identifying and remedying racist and discriminatory practice and treatment is of interest both economically and equitably as its both unconscionable and illegal in our Country under the United States Constitution.

12.    There is a community of interest in ensuring that the combined assets and available insurance of the Defendants is sufficient to adequately compensate the members of the Class for the injuries sustained, especially as to the individually named defendants. Here, the United States Constitution provides constitutional rights and equal protection of all its citizens. As such, there's a community interest in economically rectifying racist and discriminatory injuries the members of this protected class experienced.

13.    Without class certification, the prosecution of separate actions by individual members of the Class would create a risk of:

a.    Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants; and/or

b.    Adjudications with respect to the individual members which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests, including but not limited to the potential for exhausting the funds available from those parties who are, or may be, responsible Defendants; and

c.    Defendants have acted or refused to act on grounds generally applicable to

the Class, thereby making monetary and injunctive relief appropriate with respect to the Class as a whole.

14.    Questions of law and fact common to all potential Class Members predominate over any questions affecting only individual Class Members. Among the common questions of law and fact to the Class Members are:

a.    Whether Defendants maliciously prosecuted Plaintiffs from July 15, 2022 forward.

b.    Whether Defendants detained without reasonable suspicion or arrested without probable cause the Plaintiffs from July 15, 2022 forward.

c.    Whether Defendants searched Plaintiffs or Plaintiffs' property without a warrant or reasonable suspicion from July 15, 2022 forward.

d.    Whether Defendants vehicles within the meaning of the Fourth Amendment from July 15, 2022 forward, in the absence of a valid caretaking purpose.

e.    Whether Defendants violated Plaintiffs' constitutional rights to Equal Protection.

f.    Municipal liability.

## IV.    PARTIES

15.    At all times relevant hereto, Plaintiff IAN GREENE (hereafter also "Plaintiff" or "GREENE"), was and is a Black American.   Because of Defendants' widespread policies, practices and customs, he was arrested or detained by the defendants.  He was handcuffed, jailed, arrested because of his identifiably protected characteristic-Black.  He was not convicted of any crime. He did not enter any plea agreement after his arrest. GREENE is a resident of California.

16.    At all times relevant hereto, Plaintiff DEONDRE MARQUES JONES

**SECOND AMENDED COMPLAINT**

(hereafter also "Plaintiff" or "JONES"), was and is a Black American. Because of Defendants' widespread policies, practices and customs, he was arrested or detained by the defendants. He was handcuffed, jailed, arrested and maliciously prosecuted because of his identifiably protected characteristic-Black. He was not convicted of any crime. He did not enter any plea agreement after his arrest. All charges against him were dropped. JONES is a resident of California.

17.    On or about December 4, 2023, Plaintiffs filed a government claim, which was rejected on January 17, 2024. Ex. "1" & "2".

## A. CLASS REPRESENTATIVES

18.    The class action claims of class representatives, GREENE and JONES are typical of the claims of the Class that class representatives, GREENE and JONES seek to represent.

19.    GREENE and JONES will fairly and adequately protect the interests of the Class and Plaintiff do not have any interests that are antagonistic to the Class.

20.    The claims or defenses of the representative parties are typical of the claims or defenses of the class.

## B. DEFENDANTS

21.    At all times mentioned herein, Defendant CITY OF BEVERLY HILLS (hereafter also "CITY" or part of Defendants) was a public entity duly organized and existing under and by virtue of the laws of the State of California. The Beverly Hills Police Department ("BHPD") is a part of the city.

22.    The policy makers in charge of the discriminatory practices were Defendant Police Chief MARK STAINBROOK (Hereinafter "STAINBROOK" or also collectively referred to as "Defendants.")

23.    STAINBROOK as the Chief of Police is an individual who acted under color of law. His actions deprived all of the plaintiffs of their rights under the laws of the United States and the United States Constitution. STAINBROOK

had final policy making authority from Defendant CITY OF BEVERLY HILLS concerning these acts and when engaged in these acts, STAINBROOK was acting as the final policymaker for Defendant CITY OF BEVERLY HILLS and its Police Department.

24.    STAINBROOK delegated some of his final policy making authority to his subordinates and ratified the decisions of his subordinates.

25.    At all times relevant herein, defendant Officer JERRY WHITTAKER (hereafter also "WHITTAKER" or part of "Defendants"), was a resident of the County of Los Angeles, and was a police officer of the BHPD.  At all times relevant hereto, said defendant was acting within the course and scope of his employment and under color of Law.  Officer WHITTAKER's actions took place when he was on duty, during normal working hours or overtime hours as a BHPD police officer. Officer WHITTAKER acted at all times herein under the auspices, direction, command, instruction, and/or control of the BHPD and its' Chief of Police.  Defendant by his conduct and actions was carrying out the Department wide policies and practices of violating the civil rights of Black Americans (a recognized protected class) with deliberate indifference.

26.    At all times relevant herein, defendant Officer PIERRE ROMAIN (hereafter also "ROMAIN" or part of "Defendants"), was a resident of the County of Los Angeles, and was a police officer of the BHPD.  At all times relevant hereto, said defendant was acting within the course and scope of his employment and under color of Law.  Officer ROMAIN's actions took place when he was on duty, during normal working hours or overtime hours as a BHPD police officer. Officer ROMAIN acted at all times herein under the auspices, direction, command, instruction, and/or control of the BHPD and its' Chief of Police.  Defendant by his conduct and actions was carrying out the

**SECOND AMENDED COMPLAINT**

Department wide policies and practices of violating the civil rights of Black Americans (a recognized protected class) with deliberate indifference.

27.     At all times relevant herein, defendant Officer SEAN REYNOLDS (hereafter also "REYNOLDS" or part of "Defendants"), was a resident of the County of Los Angeles, and was a police officer of the BHPD.  At all times relevant hereto, said defendant was acting within the course and scope of his employment and under color of Law.  Officer REYNOLDS' actions took place when he was on duty, during normal working hours or overtime hours as a BHPD police officer. Officer REYNOLDS acted at all times herein under the auspices, direction, command, instruction, and/or control of the BHPD and its' Chief of Police.  Defendant by his conduct and actions was carrying out the Department wide policies and practices of violating the civil rights of Black Americans (a recognized protected class) with deliberate indifference.

28.     At all times relevant herein, defendant Officer JAKE SPURGEON (hereafter also " SPURGEON " or part of "Defendants"), was a resident of the County of Los Angeles, and was a police officer of the BHPD.  At all times relevant hereto, said defendant was acting within the course and scope of his employment and under color of Law.  Officer  SPURGEON's actions took place when he was on duty, during normal working hours or overtime hours as a BHPD police officer. Officer  SPURGEON  acted at all times herein under the auspices, direction, command, instruction, and/or control of the BHPD and its' Chief of Police.  Defendant by his conduct and actions was carrying out the Department wide policies and practices of violating the civil rights of Black Americans (a recognized protected class) with deliberate indifference.

29.     At all times relevant herein, defendant Officer ERIC PENA (hereafter also

"PENA" or part of "Defendants"), was a resident of the County of Los Angeles, and was a police officer of the BHPD. At all times relevant hereto, said defendant was acting within the course and scope of his employment and under color of Law. Officer PENA's actions took place when he was on duty, during normal working hours or overtime hours as a BHPD police officer. Officer PENA acted at all times herein under the auspices, direction, command, instruction, and/or control of the BHPD and its' Chief of Police. Defendant by his conduct and actions was carrying out the Department wide policies and practices of violating the civil rights of Black Americans (a recognized protected class) with deliberate indifference.

30.    At all times relevant herein, defendant Officer MATTHEW LOPEZ (hereafter also "LOPEZ " or part of "Defendants"), was a resident of the County of Los Angeles, and was a police officer of the BHPD. At all times relevant hereto, said defendant was acting within the course and scope of his employment and under color of Law. Officer LOPEZ's actions took place when he was on duty, during normal working hours or overtime hours as a BHPD police officer. Officer LOPEZ  acted at all times herein under the auspices, direction, command, instruction, and/or control of the BHPD and its' Chief of Police. Defendant by his conduct and actions was carrying out the Department wide policies and practices of violating the civil rights of Black Americans (a recognized protected class) with deliberate indifference.

31.    At all times relevant herein, all of the defendants engaged in the conduct alleged herein under color of law, and through the auspices of the City of Beverly Hills and BHPD. Plaintiffs allege that the conduct and actions of defendants as alleged herein occurred during defendants normal working hours as Beverly Hills Police Officers, Supervisors, Managers, Captains or Chief or

occurred under the pretense that either was acting as a BHPD employee or was made possible solely because of his/her/their position as a BHPD Officers, Supervisors, Managers, Captains or Chiefs.

## V.  FACTUAL ALLEGATIONS

32.    The City of Beverly Hills has a widespread, policy, practice and custom of racial profiling against Black Americans resulting in unconstitutional detentions, arrests,  and, illegal searches and seizure. These are violations of the Due Process rights and Equal Protection rights afforded in the U.S. Constitution. In the City of Beverly Hills.   Non-Black Americans are not subject to such profiling. This is demonstrated by the fact that over 90% of all arrests reported are of Black Americans while the City itself is only 1.9% Black.

33.    As part of this pattern and practice of racial profiling, 1,088 Black Americans were arrested by the BHPD between August 30, 2019 and August 31, 2021 without probable cause.  None of the 1088 Black people arrested were convicted or plead guilty to any crime.  Between August 2019 and August 2020 60.2% of the people arrested were Black  or Hispanic.

34.    The profiling of African Americans became worse after August 12, 2020, Chiefs Advisory Committee meeting with Chief Rivetti, where  "[q]uestions were asked about the 'criminal element' seen in the business district."  Two members of the Advisory Committee told Chief Rivetti "that the criminal element that is seen in the business district has spilled over into the residential neighborhoods, enough to feel uncomfortable outdoors."  They complained that the "criminal element" "was bleeding into other parts of the city."  No one from the CITY could explain what the criminal element looked like. But 'criminal element" was code for Black people.

35.    The response to this "criminal element" was to create the Rodeo Drive

**SECOND AMENDED COMPLAINT**

Team Task Force (RDT). The author of the RDT was Sgt. Fair. To cover up their constitutional violations, BHPD claimed that crime was going up. In actuality, it was down by 17%.

36.    Sgt. Fair referred to the Black people pulled over by the RDT as animals. Fair also made other derogatory comments about Black and Latin people. Fair's boss for the RDT was Captain Dowling. Dowling referred to Black people as "the n-word." Dowling's use of the "n word" and racial stereotypes would violate BHPD policy, show a discriminatory intent and deliberate indifference. Yet, there was no known discipline of Dowling for his comments, demonstrating ratification. Dowling admits to calling Black employees "lazy" "several times over the years."

37.    The RDT's stated "situation" was that the City felt too many Black people were visiting which was hurting tourism. The city did not want Black visitors to the city. Former BHPD officer Glover explained the city's rationale was there were too many Black people in Beverly Hills, and it made it look "too Ghetto." The BHPD was specifically targeting Black people giving them false tickets and charging them with crimes on false or exaggerated facts. Officer Duncan told Officer Glover, they would target Black citizens even if they did nothing wrong. Glover was also told that these "thugs" (stereotype for black people) could not afford to shop on Rodeo Drive and the BHPD needed to get them out of Beverly Hills. As justification for this task force, Officer Duncan told Mr. Glover, a black man, that "it doesn't look good" when there are black people seen on Rodeo Drive. Officer Duncan said that's why the "taskforce" to harass all black people present in Beverly Hills was developed." Black people were referred to as "douche bags" and "pieces of shit" as BHPD officers arrested them.

38.    During its operation (August 29, 2020 – October 24, 2020) the RDT made

**SECOND AMENDED COMPLAINT**

90 arrests.  80 of them were African American.  Four were Hispanic.  One was other. Three were white.  During the same time frame there were 107 arrests for EDD fraud.  Of those, 99 were African American. Four were Hispanic.  Only two were Caucasian.

39.  None of the individuals arrested by the RDT, or for EDD fraud were convicted of any crimes.   None of them entered any plea deals.  These numbers are so far out of proportion to the population of Black and Latin residents that it cannot be explained statistically other than by racial profiling.

40.  The BHPD treated their constitutional deprivation of Black people's rights as a game.   Sgt Fair, the author of the RDT said "invite your friends to come out and play."  These arrests are  "a dime a dozen."  The arrests were so typical, that officers were instructed they could cut and paste information from one arrest to another.   Thus there was commonality and typicality based on race.

41.  Putting the arrests in context, the City of Beverly Hills is only 1.95% Black and the State of California is a mere 5.8% Black. The population of Beverly Hills is 81.93% White. Yet, over 90% of the people arrested by the RDT were Black and just .025  of the individual arrested were White. Such a large disparity in the arrests of Black Americans and White Americans shows racial profiling and selective enforcement against Black Americans.

42.  The selective enforcement and discrimination against Black Americans during the RDT period is consistent with Beverly Hills' longstanding practice and policy and was ongoing during the Main class period.

43.  For 26 Field Investigation Cards covering the RDT subclass period of August 29, 2020 – October 24, 2020. The breakdown of those cards is: Black/African American: 11, or 42.31%, Hispanic: 10, or 38.46%, White/Caucasian: 2, or 7.69%, Other race: 3, or 11.54%.

- 13 -
**SECOND AMENDED COMPLAINT**

44.     The fact that over 42% of the FI cards were for African Americans during the RDT has two important common characteristics. First, 42% of the FI cards targeted Black people compared with a population that is 2% or less Black means that Black people were subjected to FIs at a rate 21 times their share of the population. Factoring in the 38% of FI cards that targeted Hispanics compared with a population that is 7% Hispanic shows that Hispanics were subjected to Fis at a rate that is five times their share of the population. Second, while Black people were 42% of the individuals given FI cards, they were approximately 90% of the people arrested leading to a typical result – African Americans were stopped more frequently than other groups, they were subjected to a greater percentage of FI cards, and they were arrested more frequently than other groups during the RDT as well as the full two-year class period.

45.     The discriminatory intent and impact of the RDT on Black people was no accident. The BHPD selected Sgt. Billy Fair to create the Rodeo Drive Team operational plan whose bias against Black Americans was explicit. He referred to Black People arrested by the RDT as "animals". The BHPD also included Captain Dowling as part of the collaborative management team to form the RDT who referred to people arrested as "domestic terrorists" when discussing criminal activity in the Business District of Rodeo Drive.

46.     As set forth in the Operational Plan, the stated purpose of the RDT was to stop people for minor quality of life infractions and subject them to searches and warrant checks.

47.     The focus of the enforcement was almost exclusively on Black people. This was a top down policy implemented by the BHPD and was approved by Chief Rivetti. Sgt. Fair and Lt. Nance prepared the RDT Operational Plan.  The Rodeo Drive Team was comprised of specific personnel under a specific

**SECOND AMENDED COMPLAINT**

operational plan and location. The RDT followed a common operational plan. The common operational plan was approved by multiple levels of supervision. Chief Rivetti was the decision maker over the RDT and approved the plan. Chief Rivetti, Assistant Chief Coopwood and Captain Dowling were part of the collaborative effort to establish the RDT.

48.    RDT members were ordered to follow the Operational Plan. One of the goals of the RDT was to have operational consistency, direction and accountability with a defined core group of officers. The RDT team consisted of Defendants Sgt. Fair, Sgt. Drummond, Ofr. Billy Blair, Ofr. Whittaker, Ofr. De La Cruz, Ofr. Lyga, Ofr. Krug, and Ofr. Ilusorio.

49.    The RDT focused its arrests almost exclusively on Black Americans. The gross statistical disparity in the arrest records shows the overwhelming focus of the RDT was to arrest Black Americans as over 90% of the persons it arrested were Black. The statistics of the persons the BHPD arrested during the RTD period for EDD fraud show a similar gross statistical disparity in the arrests of Black Americans and White people.  Out of a total 107 arrests 99 of the arrests were African American and only 2 were White. Accordingly 93% of the arrests were African Americans and only .018% of the arrests were White people.

50.    By all accounts the RDT was a failure and a waste of resources as it didn't result in a single conviction other than one nolo plea to filming without a permit. Nevertheless, according to BHPD Chief Rivetti the RDT accomplished it objectives. Rivetti's satisfaction with the results of the RDT illustrates its goals were not convictions, but rather to selectively target Black People for minor quality of life infractions in the Rodeo Drive district and to clear the area of Black people. From a conviction standpoint the RDT was a monumental failure. Other than a person filming without a permit (who received diversion) none of

- 15 -
**SECOND AMENDED COMPLAINT**

the Black Americans or anyone arrested by the RDT was convicted of anything.
Shockingly, BHPD Captain Subin said the BHPD is "not concerned with
convictions." Sgt. Fair is unaware of a single RTD arrestee being convicted of a
crime.

51.    The success of the RDT in accomplishing this goal of reducing the
presence of Black People on Rodeo Drive was celebrated by Assistant Chief
Coopwood who stated "The quality of life issues along Rodeo Drive are
beginning to diminish. It is beginning to look more normal again." In other
words, fewer Black People in the Rodeo Drive area.

52.    This selective enforcement against Black Americans was part of an official
policy and practice and was directed and ratified by the BHPD and City.
According to Chief Rivetti, "the Rodeo Drive team operational plan gave the
mission and what their objective was. According to Captain Subin all of the
RDT arrests were consistent with BHPD Policy.  Indeed, the City and Chief
Rivetti provided the RDT team with an award for its actions (of clearing out
Black visitors.)

53.    The same polices were in place during the entire Main Class Period and
continuing.

54.    The conduct of the officers during the RDT and Main Class periods was
ratified and approved of by the City and BHPD.

55.    No officers on the RDT and or BHPD have been disciplined for racial
profiling from August 2019 to 2024.

56.    The City was so pleased with the work of the Rodeo Drive Team whose
arrests were over 92% Black that it gave the task force an award for excellence.
Since so few of the arrests were prosecuted, the only goal accomplished by the
RDT was to successfully target Black Americans for arrest to discourage their

- 16 -
**SECOND AMENDED COMPLAINT**

presence in Beverly Hills and making Rodeo Drive look "normal again" with less Black people.

57.     As noted in the Los Angeles Times, between 1990 and 1995, Black Americans have filed five lawsuits and more than a dozen claims against Beverly Hills, alleging that police unjustifiably stop and harass minorities.   In one case, a Black motorist accused BHPD officers of pointing a gun at his head during  a traffic stop.  Another man alleged that his car was ransacked in a vain search for drugs.  Such lawsuits demonstrate Defendants' knowledge of the practice of profiling Black people that has existed for decades in Beverly Hills

58.     As part of this long standing policy, practice and custom, Defendants used minor infractions like broken tail lights to justify its practice of targeting Black people for unconstitutional detentions and arrests.

59.     Between 1993 and 1995 the Beverly Hills-Hollywood chapter of the NAACP received 75 complaints about Beverly Hills police officers targeting Black Americans.

60.     In defending the City's targeting of Black Americans, former mayor Chuck Aronberg said, "Blacks have a chip on their shoulder. [They] think bad things happen to them because they're Black." And Mr. Aronberg was exactly right, in Beverly Hills - bad things do happen to Black people.

61.     Illustratively, Jerry Lafayette, a Black American in Beverly Hills, was pulled over more than 20 times in 18 months for simply being Black.

62.     In 1995 the City, its Mayor, Council member, Chief and Captain were sued for having "engaged in a conscious policy of deliberate indifference" by allowing police harassment of African Americans to go unchecked.   There Defendants were made aware of constitutional violations, and with deliberate indifference ratified the wrongdoing.  Defendants failed to provide adequate

- 17 -
**SECOND AMENDED COMPLAINT**

training to safeguard the constitutional rights of Black Americans and provide them equal protection. Instead, the City continued and ramped up its' targeting and discrimination against Black Americans in Beverly Hills.

63.     The training policies of Defendant CITY OF BEVERLY HILLS were not adequate to train its police officers to handle the usual and recurring situations with which they must deal.  Defendant CITY OF BEVERLY HILLS was deliberately indifferent to the obvious consequences of its failure to train its police officers adequately.

64.     The failure of Defendant CITY OF BEVERLY HILLS to provide adequate training caused the deprivation of the rights of all plaintiffs by the actions of Defendant CITY OF BEVERLY HILLS' police officer employees.  That is, the Defendants failure to train is so closely related to the depravation of the plaintiffs' rights as to be the moving force that caused each of them the ultimate injuries such as detentions and arrests without reasonable suspicion and probable cause.  False arrest, false imprisonment, fabrication of evidence, and malicious prosecution of Black people for alleged criminal acts they were never found guilty of.

65.     In 1995, a civil rights lawsuit was filed by six Black Americans. Five of the Black Americans suing were teenagers who lived in Beverly Hills and attended local schools, and the sixth was a maintenance man at a Beverly Hills church. The BHPD stopped and harassed Black Americans without "reasonable suspicion," often pulling over Black-American motorists for violations such as broken taillights or detaining minors who were out past the City's 10 p.m. curfew. In 2000, a settlement was reached, which included the City of Beverly Hills setting up a Human Relations Commission to deal with issues of racial profiling.

**SECOND AMENDED COMPLAINT**

66.    Indeed, a former Beverly Hills Mayor, Robert Tanenbaum, sued the City for racial profiling, claiming that his "case is about people's rights to walk the street, to ride cars on public roadways without being terrorized, harassed or abused." "All we are saying is, treat Black folk like White folk."

67.    In 1998, then-Assemblyman Kevin Murray, a Black American, filed suit after his car was stopped by police on his way to celebrate a primary election victory.

68.    In August 2014, there was a potentially dangerous wrongful arrest of noted Black American film maker and producer Charles Belk.  In stereotypical fashion, the BHPD thought the film maker "fit the description" of a bank robbery suspect because Belk was "tall, bald, Black and male."  Objectively, thousands of Black men would fit such a vague description.  When stopped, Belk behaved in exemplary fashion.  He stated why he was in the city.  He related his impressive academic, business and artistic credentials that could have been easily and quickly checked.  The BHPD officers did not care.  Mr. Belk had to suffer the indignity of being handcuffed and forced to sit on the curb in public.  Then the PD successfully imposed an exorbitant amount of bail, forcing Mr. Belk to sit in jail for hours before he could even speak to an attorney.  Belk was never even given his Miranda Rights. At the time, Belk (51 years old) was working at a pre-Emmy Awards gifting suite before going to dinner.  He was arrested when he walked away from a restaurant on Wilshire Blvd.

69.    In approximately June 2015, a video entitled "Yellow Fever with Soul" was prepared by Officers Charles Yang and Stanley Shen and posted on "You Tube."  It made fun of Black Americans and Asian Americans.  The "Yellow Fever with Soul" video used a racial stereotype of a Black American man holding a chicken leg in his hand. The video referenced racial stereotypes of the

- 19 -
**SECOND AMENDED COMPLAINT**

sizes of Black men's penis'   Officer Yang was shown holding a woman's
buttocks in the video.  Stanley Shen made comments about slavery and "master"
derogatory towards Black Americans.   Yang was not punished for this at all.
Shen had been fired for a different act of misconduct, but after the Yellow Fever
video was publicized, he was reinstated.  He has since been promoted to
Detective by BHPD's chief.

70.    In March 2016, Sandra SPAGNOLI became the chief of police.  There
were three finalists for the position. The top candidate was a Black American
police chief with Oxnard PD, but she was passed over for promotion because
city council members did not want the Black woman to be "the face of Beverly
Hills."   SPAGNOLI was hired instead.  Before she was hired, defendants knew
that SPAGNOLI was sued repeatedly while she was the chief at San Leandro,
including for various civil rights violations and discrimination.

71.    As the Chief of Police, not only was SPAGNOLI the final policy maker at
the time, but she implemented policies, customs and practices designed to
deprive Black Americans of their constitutional rights and with deliberate
indifference to the rights of Black Americans which was a moving force behind
the constitutional violations suffered by the class as a whole.

72.    SPAGNOLI also created customs and practices to violate the constitutional
rights of Black Americans by ratifying  discriminatory treatment of Black
Americans by BHPD police officers.  Illustratively, SPAGNOLI set the tone of
treating Black Americans unconstitutionally by ratifying the "Yellow Fever with
Soul" video displayed by members of the BHPD.  The "Yellow Fever with
Soul" video was put on the Internet.  Portions of it were later played on
television because the media saw how racist and improper the video was.  That
video promulgated racial stereotypes of the size of Black mens penis' and stereo

types of foods that Black Americans supposedly eat like fried chicken.

73.    Instead of taking corrective action, SPAGNOLI sent a message to the troops that she approved of the video, setting an example for others to follow - that treating Black Americans differently is acceptable, and condoned.  Those who shared SPAGNOLI's racist views, were promoted.  Accordingly, the "Yellow Fever" creator, Stanley Shen was promoted to Detective by SPAGNOLI.  This gave him a raise in pay.  Shen was assigned to a specialized unit (CIT) by SPAGNOLI.   SPAGNOLI knew that the female officer that Shen was promoted over (Officer Lunsman) is married to a Black American.

74.    Yet, Yellow Fever was not the only way that SPAGNOLI created a custom and practice of encouraging racism and rewarding those officers who treated Black Americans differently.   SPAGNOLI received  complaints about Scott Dowling's racist attitudes from Lt. Foxen and Lt. Nutal.  They both advised SPAGNOLI that DOWLING referred to Black Americans as "lazy" and used other derogatory stereotypes towards Black Americans.  Within days of being told about DOWLING's racist comments which were well known in the BHPD, SPAGNOLI promoted DOWLING to Lieutenant and later, captain.   This ratification of racist comments and statements by DOWLING help to show the custom and practice of targeting Black Americans for illegal treatment and is relevant to the class action claims because DOWLING was in charge of the EDD and RDT task forces.

75.    Thus, DOWLING implemented the EDD, RDT and other practices to target Black Americans with illegal stops, arrests, jailings' and prosecutions. Demonstrating how the defendants had widespread practices and customs to violate the civil rights of Black Americans, and the deliberate indifference towards those civil rights violations as well as the discriminatory moving force

**SECOND AMENDED COMPLAINT**

targeting Black Americans in the RDT and EDD task forces (also known as the Dowling Task Force/ Operation Safe Streets) DOWLING specifically referred to the Black American individuals arrested in the Dowling Task Force, as "terrorists and animals."

76.   Black Americans were unquestionably treated differently than similarly situated members of other classes because of their race - Black and membership in the protected class of Black Americans.

77.   Former Mayor, Nancy Krasne described Terry Nutall, the highest ranking Black American BHPD officer as "scary looking", "if you saw him in the hood you would run the other way." He is a big guy. He looks like an ex-Marine. He's huge and he's a bad influence." As the Mayor, Krasne was a policy maker for the city.

78.   In approximately August, 2019, there were a series of emails between SPAGNOLI and residents of Beverly Hills regarding the racial profiling of a dark complected individual Defendants believed was Black (and later learned to be Latin American.) The young man was repeatedly pulled over by members of the BHPD when they believed him to be a Black American. Once the officers learned the man was Latin and not Black, the unconstitutional searches and seizures stopped. Indeed, Chief Spagnoli reeived more than 500 different complaints of racial profiling of Black people. None of them were investigated. No BHPD officer was disciplined because of any such complaints.

79.   But, the profiling of Black Americans did not stop. Accordingly, on February 9, 2020, Ashley Blackmon, a Black-American female, was driving in a Toyota Rav-4 through Beverly Hills around 9:30 a.m. on her way to a Sunday morning yoga class. Blackmon was thirty years old and had recently moved from New York City to Marina Del Rey for a job at Red Bull corporate

headquarters as a brand manager. BHPD officers ordered her to pull over.
Blackmon immediately complied with all instructions. Yet, five BHPD officers
pointed their guns at Blackmon or her car during that stop. All of these BHPD
officers  had either seen her driving the car alone or had been made aware that
the lone driver was Black. Prior to pulling Blackmon over at gunpoint, BHPD
officers noted her race on the radio to dispatch and requested air support.
Moreover, BHPD officers admitted before the stop that Blackmon and/or her car
did not materially match any suspects they were looking out for. Blackmon was
released. No reasonable suspicion or probable cause existed to ever stop her. She
was not convicted of any crime.  She did not plea to any crime.

80.    For 25 years the City has continued to treat Black folks differently than
White folks because of a widespread policy, custom and practice.  It is time to
put such conduct to an end.

81.    On May 15, 2020, SPAGNOLI was forced to retire due to over a dozen
lawsuits alleging misconduct by her including her making derogatory comments
against, and discrimination of various "minorities" including Black Americans
and Latin Americans, resulting in approximately $8,000,000.00 in judgments,
verdicts and settlements against the city of Beverly Hills.  After SPAGNOLI
was forced out, RIVETTI became the Interim Police Chief.   RIVETTI then
ratified and approved of the creation of the RDT.

82.    Between August 29, 2020 and October 24, 2020, RDT focused on
detaining and arresting Black American's for violations of "crimes" that White
people were not detained or arrested for, such as: CVC 21955 (jaywalking);
CVC 21456 (crossing against red hand/signal at cross walk); HSC 113.62
(smoking marijuana, and possessing cannabis products); smoking tobacco in a
public right of way (including on the sidewalk or alleyway); smoking in a city

park; CVC 23111 throwing out even an unlit cigarette; California Penal Code § 415 (playing loud music); CVC 27150(a) (having a loud exhaust); CV 22102 (illegal U-turn in business district); BHMC 5-6-801 (Riding a bicycle, skateboard, or roller skates on sidewalks in the business district (not specifically included in the statute is riding of a scooter, so Black Americans on scooters were arrested with the false charge of riding roller skates on the sidewalk)).

83.    Other statutes that were enforced against Black Americans because of their race included: solicitation for charitable purposes without a permit; filming without a permit which includes still photography on private or public property without a permit.  However, as demonstrated by the defendants' own statistics, non-Black Americans were not get stopped, detained, handcuffed, jailed or maliciously prosecuted.  Each of these detentions and arrests of Black people in Beverly Hills was part of a widespread custom and practice or policy of the defendants.

84.    On or about October 1, 2020, BHPD participated in a traffic stop of a Black driver and passenger near Rodeo Drive. The stop involved at least four officers and three police vehicles; two of the officers repeatedly refused to give their names when asked by a bystander, who was attempting to film them, and treated the would-be videographer with obvious hostility. Ultimately, the officers let the Black driver and passenger go without even a citation because there was not a reasonable suspicion to stop the motorists other than their race. There was no  probable cause to arrest them.  Nevertheless, the Beverly Hills officers asked the passenger for his identification as well as the driver. This is part of the wide spread custom and practice in Beverly Hills to try and find any little thing they can on Black Americans while not doing the same to non-Black Americans.  Thus Black Americans are subjected to more intrusive policing and

entanglement with the criminal justice system than white people. White people do not have a swarm of BHPD officers arrive for minor infractions, but they swarm for Black people. White people are not searched for weapons when jaywalking or other minor infractions, but Black people are.

85. On or about October 2, 2020, BHPD stopped and searched Versace's Vice President of Mens Footwear, Salehe Bembury. At the time, he was holding a Versace shopping bag near Rodeo Drive. Allegedly, he had jaywalked by going less than one foot out of the cross walk. BHPD officers surrounded him and searched him. They then asked for his ID and ran his name for warrants. Defendants believed that Bembury was suspicious because he was Black and shopping in Beverly Hills. In actuality, Bembury was and is a Vice President of Versace and works in Beverly Hills. While it is common for defendants to stop, surround, question, and search Black Americans for jaywalking near Rodeo Drive, non-Black Americans do not undergo the same treatment. When black people are stopped for minor offenses such as jaywalking they are consistently asked for ID and a warrant check is done, this does not happen for non-black people. Clearly, Black Americans are treated differently and unequally in deliberate indifference to their constitutional rights because of widespread customs and practices with discriminatory effect on Black Americans.

86. Because racism is so rampant at BHPD, over 12 employees of the police department filed lawsuits. DOWLING was deposed. In his deposition, he admitted to calling two Black American employees "lazy" and other racial stereotypes, "probably several times over the years." Further, DOWLING referred to the highest ranking Black American in the BHPD at the time, Terry Nutal as "lazy." At the time, Nutal was a lieutenant and a superior to DOWLING.

**SECOND AMENDED COMPLAINT**

87.    Chief SPAGNOLI was advised by two different Lieutenants (Foxen and Nutal) that they were concerned about DOWLING being racist, but SPAGNOLI promoted him from Sergeant (a supervisor position) to Lieutenant (a manager position) despite their concerns. Subsequently, SPAGNOLI promoted DOWLING to captain (a policy maker executive position.)  Accordingly, SPAGNOLI as the head of the agency, ratified and condoned the statements and actions of DOWLING.  RIVETTI was aware of the claims against DOWLING, yet allowed him to remain a Captain and thus in charge of the RDT task force.

88.    A related class action lawsuit, covering the time period of August 20, 2019 – August 30, 2021, is pending in Federal Court, CASE NO.: 2:21-cv-08698-FMO (ROAx) before the Honorable Fernando M. Olguin.  Yet, that lawsuit, and even media publicity has not stopped the actions of the BHPD.  Racial profiling continues, illustrating why an injunction is required as well as monetary damages.

89.    STAINBROOK set in motion a series of acts by his subordinates, or knowingly refused to terminate a series of acts by his subordinates, that he knew or reasonably should have known would cause the subordinates to deprive Black Americans of their rights under law. Having learned of the unconstitutional conduct by BHPD officers, Defendants failed to act to prevent their subordinates from engaging in such conduct.

90.    Defendants WHITTAKER, ROMAIN, REYNOLDS,  SPURGEON, PENA, and LOPEZ were STAINBROOK's  subordinates, and following their orders, directions, policies, practices  and customs to deprive the class of Black Americans of their constitutional rights and based on information and belief were involved in the detention and arrest of GREENE and JONES.

91.    In 2022, BHPD began reporting data (RIPA) pursuant to Cal. Pen. Code, §

- 26 -
**SECOND AMENDED COMPLAINT**

13519.4, which seeks to track and eliminate racial and identity profiling.

92.    At all relevant times herein, BHPD used pictures of Black Americans for target practice. Ex. "9".

93.    In the first RIPA report with data from BHPD, the number of stops of Black Americans by BHPD compared with stops in California was over 1,000% greater.

94.    Accordingly, Defendants engaged in conduct that showed a reckless or callous indifference to the deprivation by the subordinates of the rights of Black Americans.

95.    JONES is Black American male.

96.    On or about September 9, 2022, JONES was driving a friend from out of town near Rodeo Drive, Beverly Hills, CA.

97.    JONES was pulled over by Defendants WHITTAKER and ROMAIN without reasonable suspicion, probable cause, or any legitimate reason.

98.    Without JONES permission, WHITTAKER and ROMAIN unlawfully searched JONES' vehicle without reasonable suspicion, probable cause, or any legitimate reason. They allegedly found a gun in the vehicle.

99.    JONES' car was seized within the meaning of the Fourth Amendment by the City of Beverly Hills Police Department ("BHPD") in the absence of a valid caretaking purpose.

100.   Subsequently, JONES was charged with four counts of having a concealed weapon.

101.   On or about February 6, 2023, the Hon. James P. Cooper, III, granted JONES' motion to suppress pursuant to Penal Code section 1538.5. Subsequently, all charges were dismissed. WHITTAKER was part of the hand selected officers for the RDT

**SECOND AMENDED COMPLAINT**

102.   GREENE is a Black American male.

103.   GREENE's father is a retired Lieutenant from the New York Police Department.

104.   On or about February 23, 2023,  GREENE was  approached by the BHPD because of his  race. GREENE was falsely accused of being under the influence of alcohol or drugs while driving (DUI).  However, GREENE was not driving and GREENE was not under the influence of alcohol or drugs.  GREENE was simply sitting in his car waiting for his friend to meet him.  GREENE was listening to the car radio.  The car was not running.   The officers, REYNOLDS and SPURGEON, asked GREENE for consent to search his car and to search his person.  GREENE did not give consent, but nevertheless, REYNOLDS and SPURGEON  searched his car and person without reasonable suspicion, probable cause, or any legitimate reason.  When the officers asked GREENE for consent to be searched, the officers asked GREENE to step out of his car. GREENE asked them why?  They said GREENE was not being arrested, but they said they would be more comfortable if they could pat him down (without reasonable suspicion, probable cause, or any legitimate reason). GREENE was not threatening.  Nevertheless, despite saying GREENE was not under arrest, GREENE was handcuffed and arrested.

105.   GREENE was treated very roughly during the arrest.  The handcuffs were extremely tight and painful.   The officers, REYNOLDS,  and SPURGEON, falsely claimed that GREENE's car was running.  Thus, GREENE was arrested based on false information from the BHPD officers.  GREENE was driven to the jail after GREENE was thrown into the back seat of a police car which was very uncomfortable.

106.   Because of the rough treatment GREENE had to endure from the arresting

**SECOND AMENDED COMPLAINT**

officers, at the jail, GREENE was asked by the Watch Commander if he was okay.

107.    GREENE was locked up in jail 10 or 11 hours.    GREENE was forced to sit in a gross drunk tank.

108.    GREENE's car was seized within the meaning of the Fourth Amendment by the City of Beverly Hills Police Department ("BHPD") in the absence of a valid caretaking purpose.

109.    The Watch Commander said he was sorry about what happened to GREENE. The Watch Commander waived the fee for towing Greene's car from the BHPD, but said he could not waive the fee for the tow company.  After GREENE release from jail, Greene had to pay approximately $1800.00 to get his car out of impound.

110.    GREENE was supposedly required to go to court following his false arrest. Greene checked the local court houses.  Greene contacted the DA's office, but no where was the a record of his arrest.  There was no known court date.

111.    On or about August 10, 2023, GREENE was driving his car with a friend who is white.  The officers, PENA and LOPEZ were in front of GREENE. PENA and LOPEZ could not see GREENE's license plate since GREENE was right behind them.   They could not have seen GREENE engaged in any type of moving violation because GREENE had just come out of his friends apartment complex and only drove approximately 10-15 feet to go to an overhead street light.   At the light, PENA and LOPEZ went straight. GREENE made a left turn. Thereafter, the officers raced to catch up to him.  GREENE could see them in the rear view mirror, as they picked up speed and went behind me.  GREENE was pulled over.  PENA and LOPEZ stopped GREENE without reasonable suspicion, probable cause, or any legitimate reason. Multiple officers arrived.

**SECOND AMENDED COMPLAINT**

GREENE was ordered out of the car and feared for his safety with so many police officers near him.

112.   GREENE was detained by the officers.  GREENE's white friend was asked for his name.  He had a warrant out for his arrest, so he lied about his name to the officers.   Nevertheless, the white friend was allowed to leave while the multiple police surrounded GREENE.  PENA and LOPEZ searched GREENE's car.  GREENE was arrested, taken to jail and spent around 5- 7 hours there.   GREENE  was charged with misdemeanor possession of a controlled substance by police.  GREENE 's car was impounded. Yet, GREENE has not been charged with any crime by prosecutors.  Previously, defendants took Black individuals to jail for allegedly lying about their names.  Those individuals include but are not limited to Mr. White and Ms. Williams who are part of the currently pending class action lawsuit before Judge Olguin.

113.   Defendants and each of them had a policy, practice and widespread custom to demand identification of Black People, search them for weapons, detain them and falsely arrest them with excessive force and false charges when they would not engage in similar conduct to other racial groups.

114.   The false arrests, deliberate fabrication of charges and malicious prosecution of Black Americans resulted in the deprivation of liberty to all class members.   The actions of the defendants were the cause in fact of the deprivation of each plaintiffs' liberty.  In other words, the injuries and handcuffing of all of the plaintiffs would not have occurred in the absence of the conduct.  The actions of the defendants in racially profiling all of the plaintiffs in the class because of their race is a violation of constitutional rights and was the proximate or legal cause of the injuries.   A reasonable person would see the actions of the defendants and the resultant injury to the plaintiffs as a likely

**SECOND AMENDED COMPLAINT**

result of the conduct in question.

115. After prosecutors reviewed the (fabricated) police reports and the incidents, all charges against each class member were dropped or they were found not guilty. Thus, once prosecutors exercised independent judgment, they found there was no probable cause for the arrests of each class member, or Judges and juries determined that each class member was not guilty of any crime.

116. Each of the plaintiffs in this action have suffered common and typical harm and injuries as a direct and legal result of the actions of the defendants and each of them. The plaintiffs are entitled to economic and non-economic damages in a sum in excess of the minimum jurisdiction of this court, to fees, costs, penalties, fines, and such further relief as the court deems just. Punitive damages are justified against the individual defendants.

117. An injunction is requested to compel the City of Beverly Hills to only arrest Black Americans in accordance with Federal Constitutional requirements, to stop repetitions of unconstitutional conduct towards Black Americans.

**FIRST CAUSE OF ACTION**
**MALICIOUS PROSECUTION**
**ON BEHALF OF JONES & SUB-CLASS MEMBERS**
**AGAINST DEFENDANTS WHITTAKER & ROMAIN**

118. Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.

119. The defendants acted under color of law.

120. The acts of the defendants deprived the plaintiffs of their rights under the laws of the United States and United States Constitution.

121. This claim is brought pursuant to 42 U.S.C. §1983 and the Fourteenth Amendment of the United States Constitution for violation of Plaintiffs'

- 31 -
**SECOND AMENDED COMPLAINT**

procedural and substantive due process rights and the violation thereof resulting from the malicious prosecution by the defendants named herein and resulting false imprisonment of Black Americans.

122.   As delineated above, JONES, and all class members were wrongfully detained, handcuffed and/or arrested without probable cause, and detained without any justification and/or charged with multiple criminal counts based upon the false charges, statements, police reports, evidence and testimony presented by Defendants.

123.   JONES was wrongfully detained, handcuffed and/or arrested without probable cause, and detained without any justification and/or charged with multiple criminal counts based upon the false charges, statements, police reports, evidence and testimony presented by Defendants WHITTAKER, ROMAIN, and others.

124.   Sub-class members were wrongfully detained, handcuffed and/or arrested without probable cause, and detained without any justification and/or charged with multiple criminal counts based upon the false charges, statements, police reports, evidence and testimony presented by Defendants.

125.   Defendants directed subordinates in actions that deprived the plaintiffs of their constitutional rights.

126.   Additionally, the defendants set in motion a series of acts by their subordinates that the supervisors, managers and policy makers knew or reasonably should have known would cause the subordinates to deprive the plaintiffs of their rights, or defendants knew or reasonably should have known that their subordinates were engaging in conduct that would deprive the plaintiffs of their rights and the defendants failed to act to prevent the subordinates from engaging in such conduct.

**SECOND AMENDED COMPLAINT**

127.   Sub-class members were wrongfully detained, handcuffed and/or arrested without justification and criminally charged based upon the false charges, statements, police reports, evidence and testimony presented by Defendants.

128.   Defendants had a widespread custom and practice in violation of Penal Code section 118.1 to knowingly file materially false police reports, and make materially false statements to target Black Americans because of their race with illegal detentions, arrests, imprisonments and prosecutions.

129.   At no time did said defendants have probable cause to detain, arrest and/or charge any class members for any crime or to recommend that they be prosecuted. Notwithstanding this, with malice and conscious disregard for their rights to due process, said defendants presented false evidence and recommended all class members be charged and prosecuted. Thereafter, they meaningfully participated in the prosecution to ensure their wrongful conviction and wrongful imprisonment. But the class members were never convicted of any crime.

130.   As the actual and proximate result of the acts and omissions of said defendants as described herein, Plaintiffs were made to lose their freedom and liberty, this in violation of the Fourteenth Amendment's procedural and substantive due process guarantees.

131.   As a direct and legal result of the actions of defendants and each of them, plaintiffs suffered common and typical types of harm and economic and non economic damages in a sum according to proof and in excess of the minimum jurisdiction of this court and are entitled to costs of suit. Further, plaintiffs have incurred attorneys fees and costs for defending the criminal claims. Plaintiffs have also incurred costs in relation to the criminal case, including without limitation charges for bail, attorneys fees and other special damages all in a sum

**SECOND AMENDED COMPLAINT**

according to proof at time of trial.

132.   Plaintiffs are informed and believe that, unless restrained and enjoined by this court, defendants will continue to falsely imprison and/or maliciously prosecute Black Americans who travel through the City of Beverly Hills. It is extremely likely that defendants will continue with such unconstitutional violations.  Indeed, after the related class action lawsuit was filed, the number of stops of Black Americans by BHPD compared with stops in California was over 1,000% greater than its population.

133.   Being stopped by the police has both a lasting and traumatizing effect on Black people's mental and physical health.  "There's evidence to show that worsened mental health can occur even after lower levels of contact not involving an arrest or incarceration ." These seemingly minor police interactions can trigger a variety of common and typical responses such as harmful stigma, stress and depressive symptoms. Further, studies show a significant association between police interactions and lowered mental health, including "psychotic experiences, psychological distress, depression, post-traumatic stress. disorder, anxiety, suicidal ideation and attempts, indicating a nearly twofold higher prevalence of poor mental health among those reporting a prior police interaction compared to those with no interaction ." "Racial discrimination has been associated with a range of poorer health outcomes including respiratory conditions, diabetes, somatic complaints and chronic health conditions ." A 2019 study suggests that racism can lead to increased inflammation, increased risk of developing heart and kidney. disease and decreased quality of sleep. The effects of defendants actions have harmful and severe health implications.

134.   The aforementioned acts of said defendants were willful, wanton, malicious, despicable and oppressive and said misconduct shocks the conscience

- 34 -
**SECOND AMENDED COMPLAINT**

thereby justifying the awarding of exemplary and punitive damages against the individual defendants.  (No punitive damages are sought against the city as it is statutorily immune.)

**SECOND CAUSE OF ACTION**
**VIOLATION OF CONSTITUTIONAL RIGHT TO BE FREE**
**FROM UNREASONABLE  SEIZURES**
**ON BEHALF OF ALL PLAINTIFFS**
**AGAINST ALL DEFENDANTS EXCEPT CITY**

135.   Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.

136.   This action is brought pursuant to 42 U.S.C. §1983 and the Fourth Amendment of the United States Constitution.

137.   At all times relevant hereto, Plaintiffs possessed the right, guaranteed by the Fourth Amendment of the United States Constitution, to be free from unreasonable seizures by peace officers acting under the color of law.

138.   As described in above, Defendants violated all class members' Fourth Amendment rights by unlawfully and unreasonably detaining, handcuffing, arresting and imprisoning them without reasonable suspicion or probable cause.  Moreover, race was a motivating reason for stopping, detaining, handcuffing, jailing and/or arresting the plaintiffs.  All of the arrests to the class members were without a warrant.  They were intentional and the seizures were unreasonable.

139.   Further, as described in above, Defendants violated all class members' Fourth Amendment rights by unlawfully and unreasonably seizing Plaintiffs' vehicles absent a valid caretaking purpose.

140.   GREENE, JONES, and all class members were wrongfully seized by Defendants.

**SECOND AMENDED COMPLAINT**

141.   In doing the things described herein, said defendants acted specifically with the intent to deprive  all class members of their constitutional rights under the Fourth Amendment to be free from unreasonable seizures including unreasonable, excessive force.

142.   At all relevant times herein, Defendants were policy makers or subordinates under the direction and control of the policy makers, and were acting under color of law.

143.   Defendants further set in motion a series of acts by their subordinates, or knowingly refused to stop unconstitutional actions by the subordinates, that they knew or reasonably should have known would cause the subordinates to deprive the civil rights of all class members, but failed to act to prevent their subordinates from engaging in such conduct.

144.   Accordingly, the defendants engaged in conduct that showed a reckless or callous   indifference to the deprivation by the subordinate of the rights of others.

145.   Defendants' conduct was so closely related to the deprivation of all class members' rights as to be the moving force that caused the ultimate injuries to each class member.

146.   Said defendants subjected all class members to the aforementioned deprivations by either actual malice, deliberate indifference or a reckless disregard of their rights under the U.S. Constitution.

147.   As a direct and legal result of the actions of defendants and each of them, plaintiffs suffered harm and economic and non economic damages in a sum according to proof and in excess of the minimum jurisdiction of this court. Plaintiffs are entitled to costs of suit and attorneys fees.

148.   Plaintiffs are informed and believe that, unless restrained and enjoined by

**SECOND AMENDED COMPLAINT**

this court, defendants will continue unreasonable seizures of Black Americans
who travel through the City of Beverly Hills. It is extremely likely that
defendants will continue with such unconstitutional violations.  Indeed,
according to statements to the media, Beverly Hills plans on setting up further
task forces in the future that will continue to perpetuate racial stereotypes and
racial profiling if not enjoined.

149.   Being stopped by the police has both a lasting and traumatizing effect on
Black people's mental and physical health.

150.   The aforementioned acts of said defendants were willful, wanton,
malicious, despicable and oppressive and said misconduct shocks the conscience
thereby justifying the awarding of exemplary and punitive damages against the
individual defendants.   Because the City is immune, punitive damages are NOT
sought against City.

**THIRD CAUSE OF ACTION**
**VIOLATION OF CONSTITUTIONAL RIGHT TO BE FREE**
**FROM UNREASONABLE SEARCHES**
**ON BEHALF OF ALL PLAINTIFFS**
**AGAINST ALL DEFENDANTS EXCEPT CITY**

151.   Each and every allegation set forth in the preceding paragraphs is
incorporated herein by this reference with the same effect as if realleged herein.
However, there are no punitive damages sought against the City.

152.   This action is brought pursuant to 42 U.S.C. §1983 and the Fourth
Amendment of the United States Constitution.

153.   At all times relevant hereto, Plaintiffs possessed the right, guaranteed by
the Fourth Amendment of the United States Constitution, to be free from
unreasonable seizures by peace officers acting under the color of law.

154.   As described in above, Defendants violated all class members' Fourth

**SECOND AMENDED COMPLAINT**

Amendment rights by unlawfully and unreasonably searching Plaintiffs and/or Plaintiffs' property without a warrant or reasonable suspicion. Moreover, race was a motivating reason for searching the plaintiffs and/or plaintiffs' property.

155.   GREENE, JONES, and all class members were wrongfully seized by Defendants.

156.   In doing the things described herein, said defendants acted specifically with the intent to deprive  all class members of their constitutional rights under the Fourth Amendment to be free from unreasonable searches.

157.   At all relevant times herein, Defendants were policy makers or subordinates under the direction and control of the policy makers, and were acting under color of law.

158.   Defendants further set in motion a series of acts by their subordinates, or knowingly refused to stop unconstitutional actions by the subordinates, that they knew or reasonably should have known would cause the subordinates to deprive the civil rights of all class members, but failed to act to prevent their subordinates from engaging in such conduct.

159.   Accordingly, the defendants engaged in conduct that showed a reckless or callous   indifference to the deprivation by the subordinate of the rights of others.

160.   Defendants' conduct was so closely related to the deprivation of all class members' rights as to be the moving force that caused the ultimate injuries to each class member.

161.   Said defendants subjected all class members to the aforementioned deprivations by either actual malice, deliberate indifference or a reckless disregard of their rights under the U.S. Constitution.

162.   As a direct and legal result of the actions of defendants and each of them,

plaintiffs suffered harm and economic and non economic damages in a sum according to proof and in excess of the minimum jurisdiction of this court. Plaintiffs are entitled to costs of suit and attorneys fees.

163.    Plaintiffs are informed and believe that, unless restrained and enjoined by this court, defendants will continue unreasonable searches of Black Americans who travel through the City of Beverly Hills. It is extremely likely that defendants will continue with such unconstitutional violations.  Indeed, according to statements to the media, Beverly Hills plans on setting up further task forces in the future that will continue to perpetuate racial stereotypes and racial profiling if not enjoined.

164.    Being stopped by the police has both a lasting and traumatizing effect on Black people's mental and physical health.

165.    The aforementioned acts of said defendants were willful, wanton, malicious, despicable and oppressive and said misconduct shocks the conscience thereby justifying the awarding of exemplary and punitive damages against the individual defendants.   Because the City is immune, punitive damages are NOT sought against City.

**FOURTH CAUSE OF ACTION**
**MUNICIPAL LIABILITY FOR VIOLATION**
**OF CONSTITUTIONAL RIGHTS**
**ON BEHALF OF ALL PLAINTIFFS**
**AGAINST DEFENDANT CITY OF BEVERLY HILLS**

166.    Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein. However, there are no punitive damages sought against the City.

167.    This action is brought pursuant to 42 U.S.C. §1983 for violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments.

168.    Beginning in November 2021, STAINBROOK has been the chief of the

**SECOND AMENDED COMPLAINT**

BHPD. Prior to STAINBROOK, Rivetti and Spagnoli were the chiefs of police where they emphasized racial profiling by BHPD, which STAINBROOK endorsed and took no corrective action.

169.   While serving as police chief, STAINBROOK is the final policy-making authority for police policy in the City of Beverly Hills.

170.   STAINBROOK like his predecessors Rivetti and Spagnoli exercised control and management over the City's police department and was the final policymaker for Defendants.

171.   As police chief, STAINBROOK promulgated policies wherein police officers were ordered and encouraged to stop, detain, arrest, forcefully seize, and/or prosecute Black Americans who visited the City of Beverly Hills. STAINBROOK implemented policies, procedures and practices that deprived Black Americans of their rights under the laws of the United States and the United States  Constitution.

172.   Defendants espoused the false belief that Black Americans were a criminal threat in the City.  This is demonstrated by the long standing practice and custom of racially profiling Black Americans, with detentions and arrests that did not lead to any convictions.

173.   STAINBROOK was aware of the racial profiling and constitutional violations of Black Americans because of complaints received from citizens, various lawsuits and newspaper articles.   Moreover, STAINBROOK was aware of continuous prosecutorial rejections for charges against Black Americans improperly arrested and charged by BHPD. However, STAINBROOK implemented an express policy, custom, or widespread practice of targeting Black Americans as criminals rather than engaging in constitutional policing. The defendants had deliberate indifference to the violations of constitutional

**SECOND AMENDED COMPLAINT**

rights for Black Americans.  BHPD had a policy to violate Federal Law and the US Constitution by deprivation of equal protection, substantive and procedural due process rights and illegal searches and seizures.

174.   At all relevant times herein, class members suffered constitutional deprivations by Defendants  WHITTAKER, ROMAIN, REYNOLDS, SPURGEON, PENA, and LOPEZ because these named officers and sergeants were implementing the unconstitutional policies of Chief of Police, and the City of Beverly Hills.

175.   STAINBROOK ratified the unconstitutional actions of subordinates by continually rewarding officers for unconstitutional conduct through awards, positive evaluations, better assignments, promotions, and increased income/overtime.

176.   Thus, the policy, practice and custom of defendants resulted in violating the rights of Black Americans to be free from equal protection, unreasonable seizures, unlawful arrests, and excessive force.  Thereafter in violation of Plaintiffs' due process rights Defendants proceeded to falsify evidence, and submit false police reports so as to ensure that Plaintiffs would be wrongfully convicted.

177.   At the time of these constitutional violations, defendants CITY OF BEVERLY HILLS had policies in place, and had ratified customs and practices which permitted and encouraged their police officers to violate the US Constitution.

178.   Said policies, customs and practices also called for the City of Beverly Hills and its Police Department not to discipline, prosecute, or objectively or independently investigate known incidents and complaints of unconstitutional violations of the rights of Black individuals' rights under the Fourth and

- 41 -

**SECOND AMENDED COMPLAINT**

Fourteenth Amendments to the U.S. Constitution.  These violations were exacerbated by defendants lack of properly training its officers in constitutional policing.

179.   Defendant CITY OF BEVERLY HILLS was aware of and deliberately indifferent to a pervasive and widespread pattern and practice within the BHPD to violate the rights of Black individuals' rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.  Said defendants failed to take any reasonable measures to correct this pattern and practice and as a result ratified the actions, and Defendants have been deliberately indifferent to the civil rights violations which resulted to Black Americans as a class, including those which are described herein.

180.   Said customs and practices called for said defendants, by means of inaction and coverup, to encourage an atmosphere of lawlessness within the police department and to encourage their police officers to believe that engaging in illegal searches, seizures, due process violations and violations of Equal Protection was permissible, and that such conduct would be overlooked or would not result in any discipline for BHPD employees violating the civil rights of Black Americans demonstrating ratification of these customs and practices towards Black Americans as a group.

181.   Said policies, customs and practices of said Defendants and each of them evidenced a deliberate indifference to the violations of the constitutional rights of Plaintiffs.  This indifference was manifested by the failure to change, correct, revoke, or rescind or otherwise address said customs and practices in light of prior knowledge by said defendants and their subordinate policymakers of indistinguishably similar incidents of unjustified, unreasonable and unlawful arrests, falsification of evidence and  police reports, excessive force and other

- 42 -
**SECOND AMENDED COMPLAINT**

constitutional violations against the class of Black citizens.

182.   Defendants and each of them demonstrated a deliberate indifference to the civil rights of Black victims of the BHPD's actions as further evidenced by defendants   ignoring the history and pattern of prior civil lawsuits alleging civil rights violations, similar to those alleged herein, arising from such misconduct and the related payment of judgments or settlements of such suits, including those alleging racial  discrimination and harassment, which revealed racial animus harbored by supervisors and others at BHPD showing a belief by them that  African Americans are inferior to other groups and ratification of racial animus towards the class of Black Americans.

183.   Deliberate indifference is also evidenced by an absence of or by maintenance of an inadequate system of tort claims tracking and by maintaining an inadequate system of officer discipline and independent and objective investigation by the City of Beverly Hills and its police department which failed to identify and investigate instances of false and unlawful arrests, excessive force, falsification of evidence, denial of equal protection and other acts of wrong doing towards Black Americans.

184.   Deliberate indifference to the civil rights of victims of the BHPD's unlawful arrests and falsified evidence was also evidenced by the failure of  said defendants to adequately train and more closely supervise or retrain officers and/or discipline or recommend prosecution of those officers who engaged in unconstitutional actions towards Black Americans.

185.   Other systemic deficiencies of said defendants which indicated, and continue to indicate, a deliberate indifference to the violations of the civil rights by the officers of the BHPD towards Black Americans include:

a.     Illegal detentions and arrests without reasonable suspicion or probable

**SECOND AMENDED COMPLAINT**

cause.

b.      preparation of untrue police reports and investigative reports designed to vindicate and/or justify false and unlawful arrests;

c.      preparation of investigative reports which uncritically rely solely on the word of BHPD officers involved in unlawful arrests or in the planting of evidence and which systematically fail to credit testimony by non-officer witnesses;

d.      preparation of investigative reports which omit factual information and physical evidence which contradicts the accounts of the officers involved;

e.      issuance of public statements exonerating officers involved in such incidents prior to the completion of investigations of wrongful arrests or that are contradicted by actual evidence;

186.    Said defendants also maintained a system of grossly inadequate training pertaining to the lawful making of arrests, police ethics, the law pertaining to searches and seizures, testifying in trial and perjury, the collection of evidence, and the preparation of police reports regarding the arrests of Black American.

187.    The foregoing acts, omissions, and systemic deficiencies are practices and customs of said defendants as such caused, permitted and/or allowed under official sanction Defendant STAINBROOK to be unaware of, or intentionally overlook and ignore, the rules and laws governing the unconstitutional actions towards African Americans.

188.    The foregoing acts, omissions, and systemic deficiencies are practices and customs of said defendants which caused, permitted and/or allowed under official sanction said police officer defendants to believe that unconstitutional arrests would not result in any discipline of them.

189.    Plaintiffs are informed and believe that, unless restrained and enjoined by

- 44 -
**SECOND AMENDED COMPLAINT**

this court, defendant City will continue with its unconstitutional policy towards
Black Americans.  It is extremely likely that defendants will continue with such
unconstitutional violations.  Defendant has indicated it plans to set up new task
forces which are likely to harm the civil rights of Black people.

190.   Being stopped by the police has both a lasting and traumatizing effect on
Black people's mental and physical health.

191.   As a direct and legal result of the defendants actions, the plaintiffs were
harmed, and are entitled to economic and non economic damages in excess of
the minimum jurisdiction of this court, to attorneys fees, litigation costs, fines,
penalties, interest and such other relief as the court deems just and proper.

### FIFTH CAUSE OF ACTION
### FOR VIOLATION OF EQUAL PROTECTION
### ON BEHALF OF ALL PLAINTIFFS
### AGAINST DEFENDANT CITY OF BEVERLY HILLS

192.   Each and every allegation set forth in the preceding paragraphs is
incorporated herein by this reference with the same effect as if realleged herein.
However, there are no punitive damages sought against the City.

193.   Equal Protection Class Action claims can be brought where one class of
people is treated  differently than another by a Federal, state or local government
or its officials. This is the case when "minorities" bring discrimination claims
against governmental  entities.  Here, the "minorities" are Black Americans.
Violations of Equal Protection are particularly appropriate for class action
treatment.  Illustratively, courts even recognize "class of one" claims. If an
individual can show that he or she has been "singled out" for irrational or
differential treatment by a Federal, state or local government entity or official,
Section 1983 can be used in filing a "class of one claim."

194.   Here, there is an identifiable class of Black individuals who because of

- 45 -
**SECOND AMENDED COMPLAINT**

wide spread policies, practices and customs were arrested or detained by Defendants during the class period without a conviction of any crime, and no plea agreement.

195.   A Class action is the preferred method to resolve the Equal Protection claim because there are multiple parties with essentially identical claims.

196.   Plaintiffs are part of a recognized, identifiable and protected class.

197.   Defendant City had a widespread practice and custom of treating Black people differently than other races in Beverly Hills.  Black people were viewed by Defendants as "suspicious," "terrorists" "animals" "lazy" part of the "Black mafia" as "criminals" and otherwise inferior to White people and those who were not Black.

198.   Defendant City was deliberately indifferent to the discriminatory treatment towards Black Americans - a recognized class.

199.   The policy of the City to view Black people as inferior, suspicious, "terrorists," "animals" and otherwise differently than non Blacks was a moving force behind the constitutional violations alleged herein. Defendants wanted to make their streets safe - their policy, practice and custom was to arrest Black people to accomplish their "safe street" objective.

200.   The City's policies, practices and customs had a discriminatory effect and intent - over 90% of the arrests were of Black people while less than 2% of the people in Beverly Hills are Black.  Black people are part of an identifiable group of citizens.  They were treated differently than other races.

201.   Black people are readily apparent as a race, and the Courts have treated race as a protected characteristic.

202.   Defendant City's policies and widespread practices and customs had a discriminatory effect or discriminatory intent.

**SECOND AMENDED COMPLAINT**

203.   Plaintiffs lawfully sought to travel through or visit the City of Beverly Hills.

204.   Under the guise of various euphemisms, Defendants believed Black Americans were an undesirable presence in the City of Beverly Hills. Defendants adopted the false belief of constituents that Black Americans had criminal propensities. As such, Black individuals, in sharp statistical contrast to any other racial group, were racially profiled and regularly stopped and harassed for engaging in innocent conduct. Other racial groups were not stopped and harassed for similar conduct.  The arrests of the members of the class and sub classes were unconstitutional as demonstrated by the lack of convictions for any alleged crime.

205.   Defendants prevented Plaintiffs from lawfully walking in, driving through or otherwise visiting the City of Beverly Hills because Plaintiffs were Black Americans. Defendants implemented a policy to intimidate and deter Black Americans from coming to the City. Defendants utilized the BHPD to violate the constitutional rights of Plaintiffs because of their race which resulted in deterring Black individuals from visiting or traveling through the City of Beverly Hills.

206.   Defendants did not take similar actions against non-Black Americans. Black Americans were treated differently than similarly situated non-Black Americans.

207.   Illustratively, Black Americans were falsely stopped, detained, arrested, imprisoned, maliciously prosecuted and subjected to false, and perjured police reports for "crimes" that only Black people were detained or arrested for, specifically:  "Roller Skating on the Sidewalk" when they were not even on Roller Skates; stopping one inch or less over a limit line in a car;  For J-walking

- 47 -

**SECOND AMENDED COMPLAINT**

one inch out of a cross walk just before stepping onto the curb;  For making a U turn.  For smoking cigarettes.   White people were not stopped for these same types of activities.  The discriminatory impact, coupled with years of racially insensitive and derogatory comments, and repeated acts of discrimination shows conclusively that Defendants had a discriminatory purpose which was a motivating factor of the policy and widespread practices and customs to target and treat Black people differently than any other racial group.

208.   Plaintiffs are informed and believe that, unless restrained and enjoined by this court, defendant City will continue to treat Black Americans worse, i.e., violate their constitutional rights, who travel through the City of Beverly Hills. It is extremely likely that defendants will continue with such unconstitutional violations.

209.   Being stopped by the police has both a lasting and traumatizing effect on Black people's mental and physical health.

210.   As a direct and legal result of the defendants actions, the plaintiffs were harmed, and are entitled to economic and non economic damages in excess of the minimum jurisdiction of this court, to attorneys fees, litigation costs, interest, penalties and such other relief as the court deems just and proper.

**SIXTH CLAIM FOR RELIEF**
**BANE ACT**
**BY PLAINTIFF GREENE**
**AGAINST DEFENDANTS CITY, PENA & LOPEZ**

211.   Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.

212.   On or about August, 2023, GREENE was driving his car with a friend who is white.  The officers, PENA and LOPEZ were in front of GREENE.   PENA and LOPEZ could not see GREENE's license plate since GREENE was right

- 48 -
**SECOND AMENDED COMPLAINT**

behind them.   They could not have seen GREENE engaged in any type of moving violation because GREENE had just come out of his friends apartment complex and only drove approximately 10-15 feet to go to an overhead street light.   At the light, PENA and LOPEZ went straight. GREENE made a left turn. Thereafter, the officers raced to catch up to him.  GREENE could see them in the rear view mirror, as they picked up speed and went behind me.  GREENE was pulled over.  PENA and LOPEZ stopped GREENE without reasonable suspicion, probable cause, or any legitimate reason. Multiple officers arrived. GREENE was ordered out of the car and feared for his safety with so many police officers near him.

213.   GREENE was detained by the officers.  GREENE's white friend was asked for his name.  He had a warrant out for his arrest, so he lied about his name to the officers.   Nevertheless, the white friend was allowed to leave while the multiple police surrounded GREENE.  PENA and LOPEZ, searched GREENE's car.  GREENE was arrested, taken to jail and spent around 5- 7 hours there.   GREENE  was charged with misdemeanor possession of a controlled substance by police.  GREENE 's car was impounded. Yet, GREENE has not been charged with any crime by prosecutors.

214.   Defendants acted violently against Plaintiff to prevent him from exercising his rights under federal and state laws, e.g., freedom of bodily integrity, freedom from unlawful seizure, freedom from unlawful restraint on movement/liberty, freedom from unlawful searches.

215.   Defendants intended to deprive  Plaintiff of his enjoyment of the interests protected by federal and state laws.

216.   Plaintiff was harmed as were the other plaintiffs herein.

217.   Defendants' conduct was a substantial factor in causing  Plaintiff's harm.

- 49 -

**SECOND AMENDED COMPLAINT**

218.   The conduct of defendants directly and legally caused  Plaintiffs' constitutional violations.

219.   As a direct result of the conduct of defendants, Plaintiffs have suffered with economic and non economic damages in a sum according to proof at time of trial, and in excess of the minimum jurisdiction of this court.

220.   The damages that plaintiffs suffered from also include, but are not limited to, past, present and/or future medical, psychological, psychiatric and/or hospital bills and expenses for treatment for pain, suffering, emotional distress and other injuries caused by the conduct of defendants and each of them. General damages are also sought for emotional distress, grief, anger, fear, trepidation, and chagrin, in a sum according to proof and in excess of the minimum jurisdiction of this court as well as for the loss of the use of money, pre and post judgment interest, litigation costs, attorneys' fees and such other damages set out during trial.

221.   The aforementioned acts of said defendants were willful, wanton, malicious and oppressive and said misconduct shocks the conscience thereby justifying the awarding of exemplary and punitive damages as to all non-municipal defendants. NO punitive damages are sought against the City which is statutorily immune from such claims.

**SEVENTH CLAIM FOR RELIEF**
**FALSE ARREST/FALSE IMPRISONMENT**
**BY PLAINTIFF GREENE**
**AGAINST DEFENDANTS PENA & LOPEZ**

222.   Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if re-alleged herein.

223.   Pursuant to Cal. Government Code §§ 815.2, 815.3, Defendant CITY is liable for the acts and/or omissions of Defendants since committed in the course and scope of employment. This claim is asserted against the CITY pursuant to

**SECOND AMENDED COMPLAINT**

vicarious liability.

224.   Defendants  PENA and LOPEZ arrested Plaintiff without a warrant and without probable cause.

225.   Plaintiff was harmed.

226.   Defendants  PENA and LOPEZ conduct was a substantial factor in Plaintiffs' harm.

227.   The damages that plaintiffs suffered from also include, but are not limited to, past, present and/or future medical, psychological, psychiatric and/or hospital bills and expenses for treatment for pain, suffering, emotional distress and other injuries caused by the conduct of defendants and each of them. General damages are also sought for emotional distress, grief, anger, fear, trepidation, and chagrin, in a sum according to proof and in excess of the minimum jurisdiction of this court as well as for the loss of the use of money, pre and post judgment interest, litigation costs, attorneys' fees and such other damages set out during trial.

228.   The aforementioned acts of said defendants were willful, wanton, malicious and oppressive and said misconduct shocks the conscience thereby justifying the awarding of exemplary and punitive damages as to all non-municipal defendants. NO punitive damages are sought against the City which is statutorily immune from such claims.

WHEREFORE, Plaintiffs pray for the following:

1.     Compensation for both economic and non-economic damages suffered and to be suffered in a sum according to proof at time of trial;

2.     Medical, legal and other expenses incurred by Plaintiffs;

3.     Compensatory damages and nominal damages caused by deprivation of Plaintiffs' constitutional rights;

4.     Litigation costs;

**SECOND AMENDED COMPLAINT**

5.      Attorneys' fees, as allowed by statute;

6.      Interest;

7.      Civil Penalties as allowed by law.

8.      Punitive damages against individual defendants but not as to Defendant CITY;

9.      Injunctive Relief in the form of a consent decree to prevent BHPD from engaging in racial profiling of Black Americans again in the future.

10.     Any other relief or damages allowed by law, or statutes not set out above, and such further relief as this Court deems just and proper at conclusion of trial.

Dated: February 25, 2025                          Respectfully Submitted,
                                                  BRAD GAGE LAW, APC


                                          By */s/ Milad Sadr*
                                                  Bradley C. Gage
                                                  Milad Sadr
                                                  Attorneys for Plaintiffs

- 52 -
**SECOND AMENDED COMPLAINT**